LAMOREAUX & PETERSON, APPELLANTS, V. PHELAN, SHIR-
LEY & CALLAHAN, APPELLEES.

FILED APRIL 8, 1911.   No. 16,368.

1. Contracts: ACCEPTANCE. Where an offer is made by A and ac-
cepted by B with the further agreement that B shall at once
proceed to examine the subject matter of the contract to ascer-
tain whether it corresponds with the representations made and
shall immediately notify a designated employee of A whether
he will accept the contract, notification to that effect to the
proper person before a withdrawal of the offer and within the
time contemplated by the parties will constitute a meeting of the
minds and will close the contract.

2. ————: RESCISSION: MISTAKE. Where, after its acceptance, a party
seeks on the ground of mistake to be absolved or released from
an offer to contract, the fact concerning which the mistake was
made must be material to the transaction, and of such a nature
that, if the real facts had been known to him, he would not have
made the offer. If the mistake was with reference to some fact
not essential to the terms of the contract, or if it is not of such
a nature that the conduct of the offering party was really de-
termined or controlled by it, or if he would have made the offer
even if the fact had been known to him, then he is not entitled
to any relief on the ground of mistake.

3. ————: ————: ————. Where an offer was made by one part-
ner to enter into a contract with another person to remove earth
at a stipulated price per cubic yard, extending over several miles
of a line of railroad in process of construction, the fact that be-
fore the offer was made another partner in the firm had already
let a contract for a small portion of the offered work, which fact
was unknown to the partner making the offer, does not neces-
sarily constitute a mutual mistake between the parties to the
contract.

4. ————: ————: ————. Evidence examined, and *held* that under
the* circumstances in this case the defendants are not entitled
to be relieved from their offer on the ground of mistake.

5. ———: ACCEPTANCE. An offer was made in· Omaha by a firm of railroad contractors to another firm engaged in the same business to let them a contract to do a large amount of grading in Montana involving the removal of nearly 600,000 yards of material at a stipulated price per yard, which offer was˙ accepted with the condition that the firm to which the work was offered should at once examine the proposed work to ascertain whether it corresponded with the representations made, and should immediately notify a designated employee at the place where the work lay whether the firm would accept the contract. ·A member of the latter firm at once went to Montana for this purpose. Before the examination was made, he was informed by this employee, who had no authority to vary or modify the terms of the offer, that a portion of the work containing about 15,000 yards had been let to other parties before the offer was made, to which he replied in substance that it was a small matter and made no difference. He then told this employee that the work was as represented and that his firm accepted. *Held*, first, that the inclusion of the portion of .the work which had been previously let was not an essential element in the making of the contract, and that the notice to the designated employee that his firm accepted and would do the work was an unconditional acceptance of the offer made.

APPEAL from the district court for Douglas county: HOWARD KENNEDY, JUDGE. *Reversed.*

*D. W. Merrow* and *J. W. Woodrough,* for appellants.

*Mahoney & Kennedy, contra.*

LETTON, J.

This is an action for loss of profits arising from the alleged breach by defendants of a grading contract. At the close of the testimony in behalf of plaintiffs, the defendants moved for a directed verdict on the ground that the evidence was insufficient to establish the existence of a contract. The motion was sustained, and a judgment of dismissal entered, from which plaintiffs appeal.

The firm of Lamoreaux & Peterson is composed of Albert A. Lamoreaux and Edward Peterson. The members of the firm of Phelan, Shirley & Callahan are Ed-

ward Phelan, Michael Shirley, and William Callahan. Both parties are railroad contractors. In March, 1907, defendants held a contract to do a large amount of grading upon the Pacific coast extension of the Chicago, Milwaukee & St. Paul Railway Company in Montana. On March 28, 1907, a conversation was had in the office of plaintiffs in Omaha between Messrs. Lamoreaux & Peterson and Michael Shirley of the defendant firm. Plaintiffs' account of this conversation is in substance that at that time Shirley produced two profiles, one showing a section of work west of Forsythe, Montana (hereafter referred to as the west work), containing approximately about 400,000 yards of material to be removed, the other profile covering what will hereafter be designated as the east work. Shirley at first proposed to let a contract for the west work, but, upon being told more work was wanted, he said there was about 200,000 yards on the east work which they could have. An extended conversation took place with reference to the width of the cuts, the material to be removed, the quality of the water in that locality, the distance of the work from the town of Forsythe, and the condition of the roads for hauling supplies, also as to the price to be paid for moving the various kinds of material, which was fixed at 23 cents for earth work, 35 cents for hard-pan, 40 cents for loose rock, 55 cents for sand rock, 75 cents for solid rock, and 1 cent a yard for overhauling over 600 feet. Shirley also stated that the work must be done by November 1, 1907. In the profiles produced by Shirley, the line of railroad grade is marked with numbers at distances of 100 feet, which are known as stations. The profile of the west work included 162 stations. Shirley marked the profile of the west work at station 8,010, and said that he wanted to let all of the work from station 8,010 to the west end of the profile, station 7,390, and station 8,613 to station 2,159 on the profile of east work. Plaintiffs testify that they then accepted the offer with the reservation that Peterson should go to Montana that night to

7

examine the work, and it was agreed that, if he found it as represented by Mr. Shirley, he was to notify George Campbell, who was the foreman of Phelan, Shirley & Callahan at Forsythe.

It may be well at this stage to examine the pleadings as to the making of a contract. The petition alleges the details of the offer, alleges its acceptance by the plaintiffs, "but (plaintiffs) reserved the privilege of first visiting that portion of the roadbed to be so graded with the understanding that, if the work was such as defendants represented it to be to plaintiffs, the plaintiffs were to notify the defendants' agent then upon or in charge of defendants' business on said portion of said roadbed, whereupon the said contract for doing said work was to become absolute and binding upon 'the parties plaintiffs and defendants." It further alleges that on April 1 the agent was notified as had been agreed upon, "and thereupon the contract became absolute between the parties and binding on them."

The answer denies that the offer included all the work named in the petition, and alleges that defendants "made an oral proposition to the plaintiffs to sublet to said plaintiffs the grading of stations numbered 7,400 to 8,010, * * * at the prices stated in the petition of plaintiffs upon condition that the plaintiffs should inspect said work, and immediately upon such inspection telegraph defendants from Forsythe, Montana, an acceptance of said proposition," and afterwards agree upon the details of a written contract setting forth the terms of the contract and the specifications for the work. It further alleges: "That before said offer was made to plaintiffs by the defendants one of the members of the defendant firm had sublet to another party stations numbered 7,925 to 8,010. Said subletting was not known to the member of the defendant firm who made the aforesaid offer to plaintiffs at the time said offer was made, but after said offer was made, and before the member of the plaintiff firm * * * had made an examination of said work or had

signified any purpose to accept the aforesaid offer, said member of plaintiff firm was notified and informed of the fact that said stations had been sublet to another party." It pleads this was a withdrawal of the whole offer, and further denies the acceptance of any proposition, and that any contract was ever agreed upon. The reply is practically a general denial.

Returning to the testimony: Peterson left for Montana that night, taking with him another railroad contractor named Nicholson. He reached Forsythe on Saturday. Callahan of the defendant firm had a grading camp about 17 miles east of Forsythe. The east work was about two miles east of Callahan's camp. Peterson went to the camp, and on Sunday morning he, Nicholson, and Campbell started to drive to the west work, which was a distance of about 30 miles west. On the way Campbell told him that the work from 8,010 to 7,965 had been let to another party. Peterson said: "That did not make any difference about that little piece of work; didn't amount to nothing anyhow." The weather was inclement and the roads were muddy, so they turned back and went to look at the east work. While examining it, Campbell told Peterson there was another mile of work east of it they could have if they wanted it, which had been let to other parties who were not able to complete it. The next day they examined the west work, and after doing so Peterson told Campbell the work was "good work and just as Mr. Shirley had represented," and they "would take it." They then went to see the engineer in charge of the work, and Peterson arranged with Campbell to have a well dug and to furnish grain for the teams. When they returned, Campbell showed Peterson a telegram which had been received from Shirley, dated Omaha, April 1, reading: "Has Peterson taken work he looked at? Answer. Phelan, Shirley & Callahan." Peterson told Campbell to answer it at once, and went to the telegraph office at Forsythe with him. Campbell went in the room where the telegraph operator was. Peterson sent a

message to Lamoreaux. Nicholson and Peterson stopped at Billings, Montana, on their way home. They met Callahan at a hotel at that place. Callahan asked how. the work was, and Peterson told him it was all right and just as Shirley represented it, and that he had arranged with Campbell to dig a well and deliver feed. They arrived in Omaha on the 4th of April. On that day a letter was received from Shirley, addressed to Lamoreaux & Peterson, dated at Aberdeen, South Dakota, on April 2. In substance this letter stated that he had received a telegram from Campbell saying Peterson liked the work and would sign up for it on his arrival in Omaha, also stating that they could, have the work from station 7,925 to the west end of the profile; that at the time he told Peterson he could have the work from 8,010 west the work was let from 8,010 to 7,925; also stating the work would have to be completed before October 1, 1907, restating the price the same as in the oral conversation, and saying: "If you decide to do this work, you can ship at once and we can make contract when I get home to Omaha. * * * If you decide you don't want this work, wish you would please notify Mr. O'Hanlon at once on receipt of this letter at our office, or you can call him up over the phone, but I would like to have you do this work. I don't want you to wait until I get home for you to decide whether you want the work or not." On April 5 Peterson had a conversation with one O'Hanlon, an employee of defendants, at the defendants' office. After this conversation, and on the same day, plaintiffs sent the following telegram to defendants at Forsythe: "How much work can we have east of Callahan camp? Lamoreaux & Peterson." On the evening of the 5th a reply was received from Mr. Shirley at Forsythe, saying: "None east Callahan's camp. Do you want the other? Answer." In reply to this a night message was then sent by plaintiffs, saying: "We want and insist on having all the work agreed upon between us before Peterson left Omaha. Lamoreaux & Peterson."

Peterson testifies that his intention was by this to include as east work 8,613 to 2,519, and as west work 7,390 to 8,010, and that at the time he sent it he knew that 7,925 to 8,010 had been let before he talked with Shirley. At 3:25 on the afternoon of April 6, plaintiffs received the following telegram from Mr. Shirley at Forsythe: "We will hold work from 7,925 to 7,400 until 2 o'clock today." On April 8 plaintiffs received a telegram dated Forsythe, April 7: "You did not do as you agreed. Let work to another party. Phelan, Shirley & Callahan." This terminated the negotiations. The evidence further shows that the parties were acquaintances of long standing, and that plaintiffs had some time past performed a great deal of work under a subcontract for Phelan & Shirley in Iowa and Missouri without a written contract. It also shows that Callahan was in Omaha about March 30; that he at that time sent one O'Connor to Montana to look at work, and that O'Connor on April 8 contracted for a part of the work at a reduced price. It should be said that O'Connor testifies he was told that he was second, and that if the first parties did not take the work he could have it.

The sole question presented is whether the evidence makes a *prima facie* case showing the existence of a completed and binding contract between the parties. Assuming the facts to be as the plaintiffs testify, it is clear that the conversation in Omaha amounted to a proposal by Shirley and a conditional acceptance by Lamoreaux & Peterson. The plaintiffs' position is that, when Peterson told Campbell that the work was as represented by Shirley, was good work, and that they would do the work, this was an acceptance of the proposition and constituted a complete and binding contract. The defendants' position is, to quote from their brief, "that before Peterson had examined any of the work, either east or west, he was notified that a part of the work included in Shirley's proposition at Omaha had already been let to another party, and that upon that account defendants could not

let to the plaintiffs the identical work embodied in Shirley's proposition. In other words, he was notified that Shirley's proposition was withdrawn. This notice was reinforced by Shirley's letter from Aberdeen. What did Peterson say when he was told that stations 7,925 to 8,010 were already let, and that his firm could not have them? The only answer that he claims to have made was, as above shown; 'That did not make any difference about that little piece of work, didn't amount to nothing anyhow.' What does this answer mean? Does it mean that the fact that defendants had already let the work to another party makes no difference as to the rights of the plaintiffs, and that plaintiffs will insist that defendants break their contract with the other party and still give this work to plaintiffs, or does it mean that plaintiffs are willing to accept the remainder of the work without these 85 stations? * * * If it means * * * that plaintiffs will accept what remains of the work after cutting out these 85 stations, then it is not an acceptance of the identical offer made in Omaha, but is in the nature of a counter proposition, which is always a rejection of the original proposition."

It is also argued that the belief on the part of Shirley and the plaintiffs that it was within defendants' power to let 7,925 to 8,010 was a mutual mistake, and that no acceptance was made that did not include 7,925 to 8,010. Defendants have cited a number of authorities in support of the proposition that, if he acceptance of an offer is coupled with a condition which requires a counter acceptance, the minds of the parties do not meet and no contract is concluded. The proposition is elementary and requires no citation of authorities to support it, but it is not applicable here, because Peterson made no conditions when he told Campbell they would do the work. Did Peterson's acceptance and notification to Campbell close the contract? Plaintiffs were offered the contract to grade a definite section of track. They accepted subject to the privilege of examination and with the duty of

notifying Campbell of the acceptance. Before examination Campbell, who it is conceded by defendants was not vested with any authority to change or modify the offer or to do aught in the matter except to communicate to headquarters the fact whether Peterson accepted or rejected the proposition, told Peterson that a portion of the work had been let. Did this constitute a withdrawal of the offer before acceptance? The portion of the work spoken of was relatively small, about 15,000 yards, and it was not essential that it should be performed by the party contracting to do the other work. It was not like a portion of a building, a bridge, or other structure, work on a portion of which by others might be an obstacle to the proper carrying out of the contract. The proposed contract was to remove earth, rock, and other material to be paid for by the cubic yard. It could make no material difference to defendants whether plaintiffs removed the material on this section of the work or whether others equally reliable did so. The only thing of consequence to them was that they should be satisfied as to the persons with whom they contracted and as to the price, and since they had already made a contract with others these matters must have been satisfactory. Under these circumstances it could really have been a matter of little moment to them whether plaintiffs or Cartwright & Rumelhart held the contract for this portion of the work. They were apparently willing to deal with either. Moreover, the letter of Shirley from Aberdeen shows that the fact that 85 stations were let had no effect upon his mind with respect to the acceptance by plaintiffs of the remainder of the work. Defendants were still willing to allow the remainder of the west work to be done by plaintiffs for the same price.

These considerations apply likewise to the question of whether defendants were entitled to be relieved from their offer on the ground of mistake. Mr. Pomeroy says, speaking of the power of equity to relieve against mistakes: "The fact concerning which the mistake is made must be

material to the transaction, affecting its substance, and not merely its incidents; and the mistake itself must be so important that it determines the conduct of the mistaken party or parties. If a mistake is made by one or both parties in reference to some fact which, though connected with the transaction, is merely incidental, and not a part of the very subject matter, or essential to any of its terms, or if the complaining party fails to show that his conduct was in reality determined by it, in either case the mistake will not be ground for any relief affirmative or defensive." 2 Pomeroy, Equity Jurisprudence (3d ed.) sec. 856. In *Grymes v. Sanders*, 93 U. S. 55, Mr. Justice Swayne says: "A mistake as to a matter of fact, to warrant relief in equity, must be material; and the fact must be such that it animated and controlled the conduct of the party. It must go to the essence of the object in view, and not be merely incidental. The court must be satisfied that but for the mistake the complainant would not have assumed the obligation from which he seeks to be relieved." See, also, 1 Page, Contracts, sec. 155.

Again, subject of course to exceptions, it is a general rule that an offer to contract can only be revoked or withdrawn by one vested with authority to do so. Under the facts in this case, so far as the plaintiffs were concerned, unless the offer had been withdrawn either by a member of the defendant firm or by some one authorized to act for them with respect to the proposal, the contract was closed when it was unconditionally accepted by Peterson. Suppose that after this acceptance, accompanied as it was by the arrangements made with Campbell for the digging of a well and for the furnishing of grain and hay, plaintiffs had refused to perform the contract, and defendants had been obliged to employ others at an increased compensation to do the work, could the plaintiffs (especially after having stated that the fact of the previous letting of the 85 stations made no difference) be heard to say that they had not accepted, or that the offer

had been withdrawn before they accepted it? We think not. Two answers could be given to such a claim: First, that Campbell had no authority to modify or change the terms of the offer, and consequently the acceptance bound both parties (1 Parsons, Contracts (5th ed.) sec. II, p. 480 *et seq.;* 1 Addison, Contracts, p. *40) ; and, second, that after plaintiffs knew the facts they accepted, and at the same time waived their right to damages. We are of the opinion that, when Peterson notified Campbell that his firm would do the work, it was an acceptance of the offer; that waiving their right to the section let to Cartwright & Rumelhart was not a counter proposal; and that the contract was closed by such acceptance. To hold otherwise would be to permit the defendants to take advantage of their own mistake in an unimportant matter to relieve themselves from their offer. We also think that it was not a mutual mistake, as defendants' counsel maintain. It was the failure of one partner to inform the others of his own action.

The evidence which has been narrated of events following the acceptance of the offer really has no bearing upon the question now considered, except as it may furnish light respecting the truth of the testimony. As to the conclusion to be drawn from the facts, plaintiffs insist that the sinister inference may be made that defendants deliberately broke the contract upon ascertaining that the work could be let at a lower price, while defendants maintain that, among other evidence, the letter of Mr. Shirley shows an earnest desire to have plaintiffs enter into a contract, and that it was the intention of both parties that a written contract should be made before it was effective. With these matters at this stage of the case we have nothing to do, since we find that by the acceptance by Peterson the minds of the parties met and the contract was closed. This, in connection with evidence as to loss of profits, was sufficient to make a *prima facie* case to go to the jury.

We are therefore of opinion that the learned trial court

erred in directing a verdict for the defendants. The judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.

FAWCETT, J., not sitting.